UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

BAYLAKE BANK,

        Plaintiff,

  v.                                               Case No. 08-C-608

TCGC, LLC,

        Defendant.

---

### DECISION AND ORDER

---

TCGC, LLC, the Debtor in an underlying bankruptcy proceeding, joined by Baylake Bank, mortgage-holder on the golf course and related property owned by TCGC, commenced this adversary proceeding against the Village of Hobart. TCGC and Baylake Bank seek a determination that certain restrictive covenants on the property, a portion of which had previously been conveyed to TCGC by the Village, are either void on their face, preempted by federal law, or subject to avoidance under the bankruptcy code as liens or encumbrances and an order directing the sale of the property free and clear of such restrictions to the Oneida Tribe of Indians of Wisconsin. On agreement of the parties, I granted the Village of Hobart's motion to withdraw the referral of the case from the bankruptcy court, pursuant to 28 U.S.C. § 157(d), and ordered expedited briefing of the issues raised in the adversary proceeding. Those issues are now fully briefed in the form of cross-motions for summary judgment. For the reasons given herein, Baylake Bank's motion will be denied and Hobart's motion will be granted.

**I. Background**

The case involves a dispute over the proposed sale of the Thornberry Creek Golf Course. The golf course land had been owned by the Village of Hobart, and when Hobart sold to Jack Schweiner, a principal of TCGC, it required him to agree to a restrictive covenant and right of first refusal as to both the golf course, and the clubhouse and maintenance facility, which Schweiner owned separately at the time.[1] Baylake Bank, the financier of the purchase, approved of these conditions, and the restrictive covenants were recorded before the Bank's mortgage.

Key among the covenants is a restriction on transfer that requires the consent of Hobart if the owner attempts to sell the property to any party that would remove the real estate from the tax rolls of the Village:

> <u>Restriction on Transfer.</u> Without the express written consent of the Village of Hobart, no owner of any interest in the Subject Real Estate . . . shall transfer any interest in the Subject Real Estate to any individual, entity, . . . organization, or sovereign nation, or during the period of ownership take any action the result of which would: (1) remove or eliminate the Subject Real Estate (or any part thereof) from the tax rolls of the Village of Hobart; (2) diminish or eliminate the payment of real estate taxes levied or assessed against the Subject Real Estate (or any part thereof) and / or (3) remove the Subject Real Estate (or any part thereof) from the zoning authority and / or jurisdiction of the Village of Hobart.

(Willman Aff., Ex. B at 1.)

The Debtor filed for Chapter 11 bankruptcy, and on July 11 the Debtor and Baylake Bank, his creditor, filed an adversary complaint against the Village of Hobart. (Cisar Aff., Ex. D.) In the complaint, they raise a number of claims asserting that the covenant requiring Hobart's consent should be avoided or declared void and unenforceable. Their motivation is simple: the Debtor's

---

[1] There is some dispute over whether the document containing the restrictions was properly recorded as to the parcel of property on which the clubhouse is situated, but since the proposed plan calls for the sale of the entire property, the dispute is not material to the outcome.

2

plan seeks to sell the property to the Oneida Tribe of Indians of Wisconsin, and the Oneida intend to have the land, which sits within the Oneida reservation, placed in a federal land trust. Placing the land in trust would save the Oneida large sums of money in taxes (more than $188,000 in 2007), which likely explains why it is the highest bidder for the property and why the Bank and Debtor desire to sell to the Tribe. The restrictive covenant thus stands as a roadblock to the Debtor's ability to realize the highest price from the sale of the golf course. The motivation on the Village's end is equally simple: presumably the golf course is one of the principal tax generators in the Village of Hobart, and the Village seeks to enforce the restrictive covenant in order to maintain its tax base. I address each of the arguments the parties raise below.

**II. The Restriction on Transfer does not Violate Public Policy**

Baylake Bank first argues that the restriction on transfer is an illegal restraint on alienation and thus is void and unenforceable. Although it cites general and ancient principles of law that disfavor restrictions on alienability, it has not provided any authority supporting the notion that the relatively narrow restriction at issue here should be found void.

The principal flaw in the Bank's argument is that it is premised on an untenable misreading of the covenant itself. Baylake Bank asserts that the covenant requires the Village's consent for transfers "to any individual, entity, . . . organization, or sovereign nation," in which case the Village would essentially have veto power over *any* transfer whatsoever. Its argument focuses on the "or" in the middle of the covenant:

> [w]ithout the express written consent of the Village of Hobart, no owner of any interest in the Subject Real Estate . . . shall transfer any interest . . . to any individual, entity, . . . organization, or sovereign nation, <u>or</u> . . .

3

In the Bank's view the "or" signifies a full stop, meaning that the clause just quoted is a complete and distinct covenant requiring the Village's consent for any transfer, period. The Bank then treats the language that follows, which includes the restrictions on removing the property from the tax rolls, etc., as a completely separate covenant:

> . . . <u>or</u> during the period of ownership take any action the result of which would: (1) remove or eliminate the Subject Real Estate (or any part thereof) from the tax rolls of the Village of Hobart . . .

In the Bank's reading, this language following the "or" represents additional covenants that forbid outright (regardless of consent) the removal of the property from the tax rolls and the removal of the property from the Village's jurisdiction. That is, the Bank believes the consent requirement modifies only the first half of the covenant, and that the remainder of the covenant provides categorically that "no owner . . . [shall] take any action the result of which would remove . . . the Subject Real Estate . . . from the tax rolls." In sum, the Bank reads the restriction to mean: (1) consent is required for *any* transfer of the property; and (2) any event that would remove the property from the jurisdiction or tax rolls of the Village is categorically prohibited (regardless of consent).

There are several problems with this reading. First, the entire covenant begins with the language "[w]ithout the express written consent of the Village of Hobart, no owner shall . . ." The consent requirement thus modifies all of the clauses that follow. Because the consent requirement modifies the second half of the covenant as well as the first, it follows that those prohibitions (removing the property from the tax rolls, for example) are *permissible* in the event the Village gives consent – they are not categorically forbidden. The second half of the covenant is thus not a blanket ban on removal of the property from the tax rolls, etc., but rather signifies the purpose

4

integrated into the consent requirement in the first place. In other words, it is only when the result would violate the provisions of the second half of the covenant that the Village's consent is required.

Second, the Bank's reading invests the word "or" with far too much importance. "Or" can sometimes imply exclusivity (*e.g.*, "your money or your life"), but in the context of a statute laden with a dozen or more nouns the "or" does not signify that the covenant is divided into a consent requirement *or* an outright ban on certain results. A perfectly sensible interpretation of the language allows for the following: "Without the express written consent of the Village of Hobart, no owner . . . shall transfer any interest . . . *or* take any action the result of which would: (1) remove or eliminate the Subject Real Estate . . . from the tax rolls . . . ." The "or" in this case links, rather than divides, the two actions – transferring any interest *or* taking some other action that would offend the three conditions set forth in the second half of the covenant. They both relate back to the requirement that the Village must give consent. The "or" simply does not signify the imposition of a completely independent series of covenants in the manner the Bank suggests.

This reading is, in truth, the only sensible one. If the Bank were correct, the second half of the covenant would be largely surplusage because under its draconian reading of the provision, the Village would have veto power over *any* transfer of property. Given this broad grant of veto power, there would be no reason to write into the covenant the language about the tax rolls or jurisdiction – the Village could simply say "no" whenever it wanted. Instead, it is clear that the clauses are all linked together by purpose and language to provide that the Village's consent is required only in the three situations set forth in the second half of the covenant. Those clauses *limit* the covenant to

5

allow the Village veto power only in those very limited circumstances, and thus the covenant does not affect the owner's ability to sell the land to the overwhelming majority of potential purchasers.

Not only is the clause far more narrow than the Bank suggests, but it contains an "out" clause waiving the restriction in the event the proposed buyer agrees to compensate the Village for its loss of tax revenues:

> Notwithstanding anything in these Restrictive Covenants to the contrary, the restrictions . . . which pertain to tax assessments . . . shall be deemed to have been waived by the village . . . provided that such owner or proposed transferee will confirm and agree . . . such owner or proposed transferee will make payments to the Village of Hobart in lieu of real estate taxes . . .

(Willman Aff., Ex. B at 1.)

According to the Village of Hobart, the only thing standing in the way of a sale of the golf course is some kind of agreement to make payments to the Village in lieu of property taxes. As a result, the practical effect of the waiver provision is that the Tribe is to be treated like any other purchaser – the covenant is thus not a restriction on alienability but merely a requirement that alienability be conditioned on the Village receiving payments, whether in actual property taxes or via some kind of other arrangement. Although this makes the property less desirable to the Tribe (because having to pay taxes is worse than not having to), that is merely a matter of *market*ability rather than alienability: the covenant is no more a restriction on alienability than any other conditions (such as price and quality) that might influence any other potential buyer's decision. And it goes without saying that the effect on marketability is limited to the Tribe itself rather than the limitless universe of other potential buyers. In sum, the property is fully alienable to any of the millions of would-be buyers whose purchase would not implicate the restrictive covenant at all, and

6

it is equally alienable to those buyers who would fall within the covenant – it is just that the covenant makes these latter entities compensate the Village for its loss of tax revenue.

In addition, it is worth pointing out that the terms of Wisconsin's prohibition on restrictions on alienation do not apply. Wis. Stat. § 700.16(2), which the Bank cites in its adversary complaint, states that "[t]he power of alienation is suspended when there are no persons in being who, alone or in combination with others, can convey an absolute fee in possession of land, or full ownership of personalty." As noted above, the Debtor or Baylake Bank have a limitless opportunity to convey the golf course in fee to any number of people or entities, including the Tribe itself. Merely requiring the Tribe to be treated like any other buyer is hardly a suspension of the power of alienation. The Bank's argument that the covenant should be reviewed for "reasonableness" thus finds no support in the law, and I conclude that the covenant is not an impermissible restraint on alienation either under Wisconsin statute or the general common law principles the Bank cites.[2]

### III. The Restriction is not Pre-empted by Federal Law

Baylake Bank also argues that the restrictive covenants are preempted by federal law. In particular, it argues that because the restrictions require notice to the Village and prohibit the property's removal from the Village's tax rolls, the restrictions preclude the Oneida Tribe from applying to have the property placed into a land trust. This restriction, it argues, is preempted by federal law because it conflicts with the Indian Reorganization Act, which allows Indian tribes to

---

[2]There is no suggestion that the covenant is some sort of race-based restriction intended to prohibit Indian tribes from owning the golf course. *See, e.g., Shelley v. Kraemer,* 334 U.S. 1 (1948) (holding that judicial enforcement of restrictive covenants prohibiting sale of property to persons of designated race or color barred by Equal Protection Clause of Fourteenth Amendment).

7

apply to have their land placed into trust. *See* M.J. Sheppard, *Taking Indian Land into Trust,* 44 S.D. L.Rev. 681, 686 (1999).

When land is part of an Indian reservation, the Secretary of the Interior uses the following criteria when determining whether to place the land in trust:

> . . .
> (b) The need of the individual Indian or the tribe for additional land;
> (c) The purposes for which the land will be used;
> . . .
> (e) If the land to be acquired is in unrestricted fee status, the impact on the State and its political subdivisions resulting from the removal of the land from the tax rolls;
> (f) Jurisdictional problems and potential conflicts of land use which may arise; and
> (g) If the land to be acquired is in fee status, whether the Bureau of Indian Affairs is equipped to discharge the additional responsibilities resulting from the acquisition of the land in trust status.

25 C.F.R. § 151.10. *See South Dakota v. United States Dept. of Interior,* 487 F.3d 548, 552 (8th Cir. 2007).

Given this carefully crafted network of statutes and regulations governing the placing of Indian land in trust, the Bank argues, the private covenant that restricts (or at least heavily conditions) a sale of the land to an Indian tribe unduly intrudes into this area of federal regulation. The restrictive covenants, by preventing an Indian tribe from purchasing the land and applying to have it placed in trust, interferes with the tribe's right to take advantage of a federal scheme clearly designed to benefit such tribes.

**A. The Question of Preemption is Ripe**

Hobart first notes that the IRA does not specifically govern the acquisition of land by tribes – in fact, the regulations only apply to the *government's* acquiring of land and placing it in trust for the tribes. 25 C.F.R. § 151.1 (2008) ("Acquisition of land by individual Indians and tribes in fee

8

simple status is not covered by these regulations . . .") Hobart would concede that the statute would apply in the event the Tribe eventually applied for trust treatment, but for now it believes the argument is not yet ripe. Essentially, it argues that any discussion of IRA preemption is premature because the Oneida Tribe does not even own the land yet – it is merely asserting that *if* it purchased the land, its right to apply for trust status would be impeded. Hobart thus argues that Baylake Bank is asking the Court to issue an impermissible advisory opinion that the restrictive covenant would be preempted by federal law *if* the Oneida ever applied to have the land placed in trust under the IRA scheme set forth above. Moreover, in the event the Secretary denied the Oneida's application for trust status, the Village notes, this dispute about preemption would never even arise.

The purpose of the ripeness doctrine "is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sprint Spectrum L.P. v. City of Carmel,* 361 F.3d 998, 1002 (7th Cir. 2004) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 148-49 (1967)). As the Supreme Court has noted, "the difference between an abstract question and a 'case or controversy' is one of degree, of course, and is not discernible by any precise test." *Babbitt v. United Farm Workers Nat. Union,* 442 U.S. 289, 297-298 (1979). "The basic inquiry is whether the 'conflicting contentions of the parties . . . present a real, substantial controversy between parties having adverse legal interests, a dispute definite and concrete, not hypothetical or abstract.'" *Id.* (quoting *Railway Mail Assn. v. Corsi,* 326 U.S. 88, 93 (1945)). There are two fundamental considerations for determinating whether a claim is ripe for

9

adjudication: (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration." *Abbott Labs. v. Gardner,* 387 U.S. 136, 149 (1967).

The response to Hobart's ripeness argument would be that the dispute is hardly an abstract one because the Tribe would not undertake to purchase the land at all if it had to wait until afterwards for an adjudication about the enforceability of the restrictive covenant. That is, the dispute is a real and present one because this Court's decision on preemption would impact the current bankruptcy plan for disposing of the golf course. According to the Debtor's plan, the intent is to sell the property to the Tribe for $12,000,000 if the Village's interests are extinguished, but in the event the covenant is not extinguished the price the Oneida would be willing to pay would drop below $10,000,000 and the property could go to auction. Thus, although the preemption question depends on the occurrence of a few future contingencies (the Tribe purchasing the land, applying for and being granted trust status), the preemption question is what motivates the entire dispute in the first place. That is, to say the question is unripe is to say it will never be ripe, because the Debtor and the Tribe will not go forward with the sale of the property if I conclude they must wait for an answer.

As the Tenth Circuit has noted, the fact that there are future contingencies does not mean a claim is unripe for present decision:

> the other contingencies noted by the Utah officials-such as the possibility that the NRC may deny PFS's license application or that the Department of the Interior may rescind its conditional approval of the Skull Valley Band's lease-do not render the case unfit for judicial review. Although such decisions would clearly affect the issue of ultimate concern to the parties-whether the SNF storage facility is constructed-the question of whether the federal licensing proceeding can now proceed without a separate Utah state licensing scheme imposing additional legal requirements upon

10

PFS and the Skull Valley Band is a legal issue that currently affects the parties and may now be decided.

*Skull Valley Band Of Goshute Indians v. Nielson,* 376 F.3d 1223, 1238 (10th Cir. 2004).

In *Marusic Liquors, Inc. v. Daley,* the Seventh Circuit likewise rejected a ripeness challenge under similar circumstances. 55 F.3d 258 (7th Cir. 1995). There, the City of Chicago had enacted a moratorium on liquor licenses in certain areas, which adversely affected the marketability of the plaintiff's business. Even though the plaintiff did not have any concrete time frame or plan for selling his store, the court concluded that his challenge to the ordinance was nevertheless ripe because the challenged ordinance reflected a "conclusive decision about transferability." *Id.* at 261.

> True, it is an open question whether, and if so when, Marusic will try to sell the store. Yet the ordinance has immediate effects: knowing that he cannot sell his business, Marusic will invest less in maintaining and expanding it; he will be less willing to train for and seek out other lines of business, because a change of career will impose a large capital loss (he paid $100,000 for the liquor store in 1990); other persons interested in operating a liquor store will do less searching (they will avoid the freeze zones), so Marusic has a lower likelihood of receiving an attractive offer; and of course if buyer and seller should get together in the future, they would have to bear the delay and costs of trying to upset the ordinance before consummating their deal. The law defeats any possibility of selling the business on short notice, an entitlement of value to property owners. These effects are similar to other costs (including opportunity costs) that have led the Supreme Court to deem disputes ripe.

*Id.*

The same is true here. Even though the ultimate application of the restrictive covenant at issue might be contingent on the Secretary of the Interior's decision on whether to place the land in trust, the existence of a restrictive covenant affects the transferability of the land *now* and looms large over the current bankruptcy plan. After all, it is the Village's position that the covenant must be enforced and the sale to the Oneida be prohibited or conditioned on a quasi-tax payment agreement. Given that stance, the Village is hardly in a position to say the dispute is not yet ripe.

11

Finally, it is clear that a delay in the decision on the preemption question would unduly burden the parties. As noted earlier, a delay in the decision is as bad for the Bank, the Tribe and the Debtor as an adverse decision, because the uncertainty of the issue will impact the viability of the current bankruptcy plan. "To delay a decision would impose upon PFS and the Skull Valley Band the uncertainty of not knowing whether they will be required to incur the substantial expenses and comply with the numerous regulatory requirements imposed by the Utah statutes." 376 F.3d at 1238.

In sum, I disagree that the Bank is asking the Court to issue a merely advisory opinion. No one has disputed that the Oneida Tribe has a concrete plan to purchase the property and apply for trust status, and the Bank and Debtor clearly want a sale to the Tribe to move forward. The Village has indicated its position that the restrictive covenants are enforceable, as written, and it indicates an intent to enforce them through the judicial process and prohibit (or condition) a sale to the Oneida Tribe. The question thus presents a real controversy about the Debtor's current plan regarding the sale of the property, and that controversy "is a legal issue that currently affects the parties and may now be decided." *Id.*

**B. The IRA does not Preempt the Covenants**

Concluding that the matter is ripe for decision does not mean the Bank wins. Hobart argues that even if the matter is ripe for adjudication, the Indian Reorganization Act does not conflict with Hobart's interests here. Preemption is a doctrine based on the Supremacy Clause, and in short it means that when Congress has enacted a federal policy on a given issue, state law claims in conflict

12

with federal policy are preempted.[3] "Conflict preemption analysis examines the federal statute as a whole to determine whether a party's compliance with both federal and state requirements is impossible or whether, in light of the federal statute's purpose and intended effects, state law poses an obstacle to the accomplishment of Congress's objectives." *Whistler Investments, Inc. v. Depository Trust and Clearing Corp.,* 539 F.3d 1159, 1164 (9th Cir. 2008).

When a preemption argument is raised, it usually involves an assertion that a state law or regulation is preempted by federal law. Here, the Bank seems to be arguing that a private contract relating to land is preempted by federal law. Such an argument fits less snugly within the traditional considerations involved in the preemption doctrine, as the argument is not targeted at a specific law or claim apart from the state's general law of contracts or property (which would otherwise allow enforcement of the covenant):

> Although Congress possesses power to preempt even the enforcement of contracts about intellectual property-or railroads . . . courts usually read preemption clauses to leave private contracts unaffected. *American Airlines, Inc. v. Wolens,* 513 U.S. 219 (1995), provides a nice illustration. A federal statute preempts any state "law, rule, regulation, standard, or other provision . . . relating to rates, routes, or services of any air carrier." 49 U.S.C. App. § 1305(a)(1). Does such a law preempt the law of contracts-so that, for example, an air carrier need not honor a quoted price (or a contract to reduce the price by the value of frequent flyer miles)? The Court allowed that it is possible to read the statute that broadly but thought such an interpretation would make little sense. Terms and conditions offered by contract reflect private ordering, essential to the efficient functioning of markets.

*ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447, 1454 -1455 (7th Cir. 1996).

---

[3] Although the parties do not discuss at any length the various forms of preemption, Baylake Bank's principal argument is based on conflict preemption. It argues briefly that "field preemption" would apply (meaning that Congress has determined to occupy the entire "field" of Indian land law), but again that argument falters for the reasons set forth herein. As applicable here, the IRA does not evidence anything more than a mechanism for the government to buy land that tribes already own – it does not give tribes a right to buy any land that might otherwise qualify for trust status.

13

However the preemption question is framed, it is clear that the IRA does not preempt either the private covenant at issue here or any Wisconsin law instrumental in enforcing that covenant. As Hobart has noted above, the IRA and its regulations only apply to the government's own acquisition of property *once a Tribe has applied for trust status*. That is, it has nothing whatsoever to say about how private entities go about creating property rights, even when those rights may have collateral effects on other parties who would otherwise be able to invoke the federal system. The procedures espoused in the IRA and its regulations do not somehow create an underlying "right" to apply for trust status, and they certainly do not invest in tribes the "right" to purchase any land within their reservations and then have that land placed in trust. In other words, the fact that a federal system exists to deal with tribal applications for trust status does not mean the Tribe has an underlying right to accomplish all of the prerequisite activities necessary to qualify for applying for that system in the first place. Such a result would grant a quasi-property right to tribes over any land within the boundaries of their reservations, and Baylake Bank has not provided any authority that even hints that the IRA would extend so far.

Moreover, the conflict preemption analysis asks whether it is possible to comply with both state and federal law, and in this case it is certainly possible to do so. The regulations governing trust applications require the Secretary of the Interior, in ruling on an application for trust status, to consider such things as the impact on the community of the land's removal from the property tax rolls. 25 C.F.R. § 151.10(e). As such, if the Secretary denies the application, implementing the IRA and its regulations may result in essentially the same outcome as enforcing the restrictive covenants at issue here, namely, the property remaining *on* the tax rolls of the Village of Hobart. The fact that the covenants might effectively decide the question before it may even be brought to the Secretary does not mean that their enforcement is inconsistent with the IRA and its regulations.

14

Finally, Baylake Bank argues that the IRA sets forth a general Congressional policy in favor of increasing Indian trust land, and that the covenants at issue here conflict with that general policy. First, I note that to the extent there exists such a policy, it is not as one-sided as the Bank suggests. As noted above, the regulations require the Secretary of the Interior to consider such issues as the effect on the community and the tax rolls, and in that sense the restrictive covenants are at least partially consistent with explicit federal policy. More importantly, even if the pro-trust policy were as clear as the Bank argues, the notion that the covenants somehow preclude the Oneida Tribe from having the land placed in trust is false. As discussed earlier, the Oneida have the freedom to purchase the land under the same terms as any other buyer would. Under the covenants, if the Tribe agrees to pay the Village the equivalent of the property taxes it would otherwise owe, the Village would automatically waive the consent and transfer restrictions.[4]

In sum, nothing in the IRA affects the ability of private entities to enter into a covenant that runs with the land, even though the covenant may adversely impact a given tribe's desire to purchase that land. *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 229 (1995) ("A remedy confined to a contract's terms simply holds parties to their agreements-in this instance, to business judgments an airline made public about its rates and services."). Obviously, if the Village had

---

[4] The parties do not discuss the covenant's restriction on removing the property from the Village's zoning authority and/or jurisdiction. Presumably if the land were placed into trust, the Village would lose jurisdiction over the land, and the consent provisions of the restrictive covenant would allow it to bar a sale to the Tribe on that basis. *Carcieri v. Kempthorne,* 497 F.3d 15, 21 (1st Cir. 2007) (noting that regulations under the IRA provide that "none of the laws . . . of any State . . . limiting, zoning or otherwise governing, regulating, or controlling the use or development of any real or personal property . . . shall be applicable" to land held in trust for a tribe by the United States.") (citing 25 C.F.R. § 1.4(a)).

Hobart's briefs take the position, however, that if the tax issue is resolved by an agreement, it would have no power to stand in the way of a sale. (Dkt. # 15 at 22; Dkt. # 29 at 2.) Presumably that means it would not attempt to bar a sale so long as a financial arrangement can be obtained with the Tribe, and thus the jurisdiction / zoning clause of the covenant would not apply.

15

elected instead to lease the property to TCGC and retain title itself, no one would consider its refusal to sell to the Tribe, absent an agreement on payment in lieu of property taxes, a violation of the IRA. The Village's use of a restrictive covenant to achieve the same purpose is no more objectionable. Presumably, the Village paid for this protection of its tax base in the form of a lower purchase price than it otherwise could have obtained. Although the IRA creates a system for applying for trust status, it has nothing to say about how tribes and landowners go about purchasing and selling otherwise eligible land in the first place. As such, there is no basis to preclude enforcement of the covenants on the basis of conflict preemption.

**IV. The Village's Interests may not be Avoided under §§ 363 or 1123**

Baylake Bank also argues that 11 U.S.C. § 363(f) allows the trustee to sell the property free and clear of Hobart's interest. The relevant portions of that section are as follows:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if --
> . . .
> (3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
> (4) such interest is in bona fide dispute; or
> (5) such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

Baylake Bank first argues that Hobart's interests in the property are tantamount to a "lien" on the property. Because 11 U.S.C. § 363(f)(3) allows assets of the bankruptcy estate to be transferred free and clear of any liens and encumbrances, it follows (it argues) that the golf course may be transferred regardless of Hobart's "lien."[5]

---

[5]This argument also implicates 11 U.S.C. § 1123(a)(5)(D), which provides that a plan must provide for sale of the estate property "either subject to or free of any lien." Because the Village's interests are not lien, that provision does not apply either.

16

But neither a restriction on sale nor a consent clause constitute "liens." Baylake Bank valiantly suggests that the economic reality of the property restrictions puts them into the category of security interests, but that is not true. A lien is form of encumbrance to property securing a debt or other obligation. It is based on a relationship of creditor and debtor. The mere fact that the Village has some level of control over another's property does not mean it has a security interest in that property. Hobart, after all, has not loaned the Debtor any money, nor can it obtain a judgment against the property based on its interests in the property. In short, the covenants at issue here do not bear any resemblance to encumbrances that secure debts. *In re 523 East Fifth Street Housing Preservation Development Fund Corp.,* 79 B.R. 568, 570 (Bkrtcy. S.D.N.Y. 1987) (noting that restrictive covenant "is not a lien"); *Miller v. Chapek,* 1992 WL 12003989 (Bankr. W.D. Wis. 1992). Accordingly, § 363(f)(3) does not apply.[6]

---

[6]The Bank's response brief makes an argument that § (f)(4) would apply as well because the Village's interest "is in bona fide dispute." This argument is likely waived for failure to raise it in the Bank's initial summary judgment brief, especially given that it is the Bank's burden to show a bona fide dispute. Regardless, the "dispute" Baylake Bank cites is based solely on the very arguments it makes elsewhere about the validity of the covenant. Undoubtedly the Code does not allow a trustee to sell property free and clear of any interests merely because the debtor or its creditor alleges a dispute exists.

Instead, the dispute must relate to a debt rather than something like the covenant between third parties that is at issue here. As the district court found in *In re Restaurant Assoc., L.L.C., "*Meadowbrook is correct that the dispute contemplated by § 363(f)(4) is the validity of the debt, and not tangential disputes, such as the applicability of the covenants, that are in issue here. When the alleged dispute concerns the rights of third parties and not the debtor, bankruptcy courts should use § 363(f)(4) with caution." *In re Restaurant Associates, L.L.C.,* 2007 WL 951849, *9 (N.D. W. Va. 2007) (citations omitted); *see also In re Octagon Roofing,* 123 B.R. 583, 590 (Bkrtcy. N.D. Ill. 1991) (citing *In re Busick,* 831 F.2d 745, 749 (7th Cir. 1987) (bona fide dispute must involve dispute over debt)).

17

Baylake Bank also argues that § 363(f)(5) should apply. That section allows the trustee to sell property free and clear of any interests if the entity with the interest "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest." 11 U.S.C. § 363(f)(5). The Bank argues that the Village's interest can be reduced to a monetary claim and, as such, can be avoided.

While it is true that Hobart's interest is ultimately a monetary one – it wants to preserve its tax base – that does not mean it could be "compelled" to accept only monetary damages in satisfaction of its interest. The restriction on transfer requires the Village's consent, which the Village may or may not give. Thus, although its motivation may be a monetary one, the restriction gives the Village a right to *act* that may be enforced through injunctive relief wholly apart from any monetary damages it may sustain. *Cobb v. Milwaukee County,* 60 Wis.2d 99, 112, 208 N.W.2d 848, 855 (Wis. 1973) ("It is well established that an injunction may be used to prevent prospective or threatened violations of a restrictive covenant.") This is not uncommon, of course. Many disputes can be resolved, at the option of the plaintiff, through injunctive relief *or* damages, and one could not say in such a case that the plaintiff could be "compelled" to opt for the monetary option. Outside of the bankruptcy context, faced with the same circumstances the Village would be entitled to bring a claim to enjoin the sale – it need not wait for the sale to go through and then sue for damages.[7]

---

[7]The Village's briefs imply that consent would be forthcoming – or even *required* – if agreement were reached on a suitable substitute for tax payments. Even so, that apparently is a concession for purposes of this individual case. It does not mean the Village could be "compelled" in any court to accept monetary damages in lieu of its consent rights.

18

In *Gouveia v. Tazbir,* the only Seventh Circuit case analyzing § 363(f)(5), the court undertook the same analysis, noting that the existence of possible equitable relief meant that the holder of the interest could not be compelled to accept a "money satisfaction".

> In reading the text of the statute we note that an entity must be able to be "compelled" to accept money damages in lieu of equitable enforcement before subsection (5) will apply. From this language we conclude that if the money damages are available upon the consent of those who hold the covenant, then such persons are not compelled to accept money, and thus § 363(f)(5) does not apply. The pertinent language of the covenant provides as follows:
>
> Enforcement shall be by proceeding at law or in equity against any person or persons violating or attempting to violate any covenant either to restrain violation or recover damages.
>
> In reading this language the bankruptcy court determined that the Lincoln landowners have the option to pursue monetary damages, but that the landowners cannot be forced to forego equitable relief in favor of a cash award. Thus, the court concluded, § 363(f)(5) does not apply to the Lincoln Covenant. We again agree.

37 F.3d 295, 299 (7th Cir. 1994).

The same holds true here. Although the Village might have the option to obtain money in satisfaction of its interest (an event accounted for in the restrictive covenants themselves), that does not mean it could be *compelled* to accept money.[8] Accordingly, § 363(f)(5) is not applicable here.[9]

---

[8]The Bank argues that because injunctive relief is not guaranteed (it is up to a court's discretion), somehow that means the Village *could* be compelled to accept monetary damages. The statute does not deal in hypotheticals, however. The question is whether money is the only relief that could be ordered, and clearly that is not the case.

[9]The Bank also makes a cursory argument that § 363(e) would apply. That section directs the bankruptcy court, on the request of any entity with an interest in the property to be sold, to "prohibit or condition such . . . sale . . . as is necessary to provide adequate protection of such interest." *Precision Industries, Inc. v. Qualitech Steel SBQ, LLC,* 327 F.3d 537, 547 (7th Cir. 2003). It is unclear how this section would apply here, however. The party with the interest in the property (the Village) has not requested such relief, and thus § 363(e) is not applicable. Moreover, presumably if it were raised the appropriate protection for the Village would be to approve the sale and require one or more parties to compensate the Village for its lost tax revenue, and that does not seem to be a remedy that any of the entities aligned with the Plaintiff would accept.

19

**V. Conclusion**

For the reasons given above, none of the Bank's arguments justify avoiding the restrictive covenants or finding them unenforceable. Accordingly, Baylake Bank's motion for summary judgment is **DENIED**. And because I find the covenants enforceable as written, there is no need to consider the Village of Hobart's affirmative defenses. The Village of Hobart's motion for summary judgment is **GRANTED**, and the adversary complaint is **DISMISSED**.

Dated this   30th   day of September, 2008.

                                                         s/ William C. Griesbach
                                                        William C. Griesbach
                                                        United States District Judge